Filed 4/1/22  P. v. Rubio CA2/8
Opinion following transfer from Supreme Court

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B301744 |
| Plaintiff and Respondent, | Los Angeles County Super. Ct. No. LA085006 |
| v. | |
| JOSE HIPOLITO RUBIO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Alan K. Schneider, Judge.  Affirmed.

Tanya Dellaca, under appointment by the Court of Appeal, for Defendant and Appellant.

Matthew Rodriquez, Acting Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, and David A. Voet, Deputy Attorney General, for Plaintiff and Respondent.

_____

This case came before us again due to a docketing issue.

We filed our opinion on November 4, 2021. Appellant Jose Hipolito Rubio petitioned for review. This court then discovered Rubio's reply brief had not been docketed and alerted Rubio's counsel. The California Supreme Court directed us to vacate our decision and to reconsider the matter in light of Rubio's reply brief. We have done so. We have considered the reply brief and Rubio's supplemental letter brief. We are refiling the original opinion with minor changes.

***

Appellant Jose Hipolito Rubio was convicted of two first degree murders with special circumstances. The trial court sentenced appellant to two consecutive terms of life without the possibility of parole and further imposed two 25-years-to-life enhancements for the use of a firearm causing death. At the time of sentencing, appellant's counsel neither alerted the trial court of its discretion to strike or dismiss the gun enhancements nor requested the imposition of lesser ones the jury had found true.[1] Appellant contends this was ineffective assistance of counsel. We disagree and accordingly affirm the judgment.

**Pertinent Procedural History**

On August 21, 2019,[2] the jury returned verdicts convicting appellant of the first degree murders of Cassandra Anguiano

---

[1]     The People's sentencing memorandum argued that the trial court lacked discretion to dismiss or strike the gun enhancement which, based on the passage of Senate Bill No. 620, was erroneous.

[2]     In light of an error in the record that we discuss below, the date the verdict was returned is important.

(Anguiano) and Victor Caceres (Caceres). (Counts 1 & 2.) As to each of the two murder counts, the jury found true that appellant had personally used a firearm within the meaning of Penal Code section 12022.53, subdivisions (b), (c) and (d).[3] Subdivision (d) of section 12022.53, which was the enhancement eventually used in the imposition of appellant's sentence, provides for a term of 25 years to life for a person who intentionally discharges a firearm causing great bodily injury or death. The jury also found true the special circumstance under section 190.2, subdivision (a)(3) that appellant had been convicted of more than one murder in the first degree. In addition, the jury found appellant guilty of being a felon in possession of a firearm (count 3, § 29800, subd. (a)(1)) and of cruelty to an animal (count 4, § 597, subd. (a)).

The People's sentencing memorandum was filed on September 9, 2019. In pertinent part, the People's sentencing memorandum stated that "the court must sentence [appellant] to 25 years to Life consecutive for each Penal Code Section 12022.53(d) allegation that was found true" and that appellant "cannot be sentenced to a lesser term than PC 12022.53(d)'s 25 to Life." (Underscoring omitted.)

The sentencing proceedings took place on September 12, 2019.[4] Proceedings commenced with the victim's impact

---

[3]     Statutory references are to the Penal Code.

[4]     The reporter's transcript erroneously states that the sentencing hearing took place on August 12, 2019. That of course was impossible since the verdict was returned on August 21, 2019. The clerk's transcript shows the sentencing date to be September 12, 2019.

3

statement by Norma Ceballos (Ceballos), Anguiano's mother, who was followed by a family member speaking for Caceres. There were two more speakers for the Ceballos family, including a brother of Anguiano.

Following these statements, the court gave appellant an opportunity to address the court. Appellant declined. At that time, a brief exchange took place between the court and appellant.[5] After an outburst from the audience, the short conversation between appellant and the trial court ended with the court's observation that appellant would be living the rest of his life in a jail cell, which the court noted was unfortunate.

The defense did not file a sentencing memorandum and did not present an argument on sentencing.

After ascertaining that arraignment for judgment and sentencing was waived and there was no legal cause why the sentence could not be imposed, the trial court sentenced appellant to two consecutive terms of life without the possibility of parole on the murder counts. The court then imposed two

---

[5]     "The Court: Mr. Rubio, you smirk now and I know that a lot of that is simply because you're afraid. You feel foolish. This was so senseless. It was just senseless, and it's tragic. You ruined your family. You ruined your life and you ruined both victim families' lives and of course ended their life over nothing, and I also know that you are a very immature person, and that's in your own polluted head right now. You're still smirking. [¶] The Defendant: That was the whole reason for this, to get over it, you know."

consecutive terms of 25 years to life under subdivision (d) of section 12022.53 on the murder counts.[6]

The court additionally sentenced appellant to the midterm of two years on count 3 to be served concurrently with the six-year sentence on count 4, which is composed of a midterm of two years with an enhancement of four years under subdivision (a) of section 12022.5 (use of firearm).[7]

Other aspects of the sentence, such as the restitution fine of $2,000, are not material to the appeal.

### Statement of Facts

This appeal is limited to the imposition of the two 25-years-to-life enhancements under section 12022.5, subdivision (d). In light of the limited nature of the appeal, we provide an abbreviated summary of the facts. Nonetheless, the manner in which the murders were committed is relevant in assessing his ineffective assistance of counsel claim.

### 1. Prelude

According to Ceballos (Anguiano's mother), appellant and Anguiano were in a relationship when Anguiano brought appellant to Ceballos's home on September 22 or 23, 2016. The occasion was Ceballos's birthday, although their connection appeared romantic in nature. Anguiano wanted to take care of appellant who she said did not have a mother. Appellant appears

---

[6] The court struck the findings under subdivisions (b) and (c) of section 12022.53. Respectively, these subdivisions impose terms of 10 and 20 years.

[7] A prior strike conviction, a prior conviction for a serious felony and the allegation that appellant had served three prior prison terms were dismissed on the People's motion.

to have spent some time in the Ceballos's home although, according to Ceballos, he never said much.

The relationship did not last. By October 16, 2016, Ceballos noted that the interaction between appellant and Anguiano had changed for the worse, with neither comfortable or happy. By October 21, 2016, appellant was sending vaguely hostile e-mails to Anguiano about picking up her belongings.

In what turned out to be a fateful development, on October 23, 2016, Anguiano brought Caceres to the Ceballos house. Ceballos believed that Caceres was courting Anguiano, calling her a princess. In turn, Anguiano appeared "interested" in Caceres.

Tragedy struck the next day, on October 24, 2016.

## 2. The Murders

On the morning of October 24, 2016, Ceballos went to work, leaving Anguiano and Cruz Campos (Campos), a woman to whom Ceballos rented a room at her home. Later that morning, Anguiano called and asked to borrow Ceballos's car. A little bit later, around 10:45 a.m. or 10:50 a.m., Campos's son called Ceballos talking fast and very agitated and told her: "Run to your house. They're shooting at your daughter."

According to Campos,[8] at around 10:30 a.m., she went outside to take out the trash, spoke to Anguiano on the way and then returned to her bedroom. Around 11:00 a.m., Campos heard two gun shots. She threw herself on the floor. She heard Anguiano scream repeatedly: "No, please no" and "Don't kill

---

[8]     After the court found Campos unavailable, her preliminary hearing testimony was read into the record.

6

me."[9]  Campos heard four or five more gunshots while she was on the floor.

At 11:00 a.m., Jennifer S. was sitting in her backyard, when she heard "a bunch of noise" which sounded like trash trucks.  But she could not make out what the noise was.  About five minutes later, Ceballos called, sounded panicked, scared, and screaming that someone was shooting her baby.  She asked Jennifer to see what was happening.  Jennifer ran across the street and, when she reached the driveway, saw a man, later identified as Caceres, lying face down in the carport with a gunshot wound to his head and blood coming from his ears.  When police arrived later, the police noted multiple gunshot wounds to the chest area and a couple wounds to the head.

Ceballos arrived within five minutes, told Jennifer that Anguiano was there somewhere and then went to look for her.  They went toward the backyard, through the already open back gate, and found Anguiano with blood on her face near the kitchen door of a converted garage.

When police arrived, Anguiano's body was in a seated position leaning slightly slouched against a wall, with gunshot wounds to her neck and jaw, and spent nine-millimeter bullet casings and a cell phone nearby.  Officer Fred Sigman noticed blood droplets around Anguiano's body and a blood trail into the side of the yard, where he found Ceballos's dog, Fleshy, cowering and bleeding from its neck.  The dog had been shot in the head.

The parties stipulated that Caceres's cause of death was five gunshot wounds, that Anguiano's cause of death was two

---

[9]      Referring to Anguiano's outcries, Campos's formulation was "Many times she repeated it."

gunshot wounds and that the manner of death in both cases was homicide.

### 3. *Evidence of Appellant's Guilt*

The appeal does not contest that it was appellant who committed the murders. A judgment is presumed to be correct and error must be affirmatively shown. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564;[10] see generally 9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 355, pp. 409–410.) There is no need to review the evidence that the jury relied on to convict appellant of the charges of which he was found guilty.

Nonetheless, since we affirm a judgment imposing the most serious sentence short of capital punishment, we briefly note the evidence that showed that appellant was guilty of the murders.

The appellant lived with his father on 11255 El Dorado Avenue about 12 miles from Ceballos's home on Oso Avenue. It takes between 15 and 18 minutes to cover the distance by car. A surveillance video acquired by detective Mathew Kohl from a house on El Dorado Avenue across the street from 11255 El Dorado Avenue shows the exit of a vehicle driven by a male from the house on El Dorado Street about 15 or 20 minutes prior to the murders and the return of that vehicle after the murders.

Appellant was dropped off at the Mexican border by some friends in the early hours of October 25, 2016. He was arrested on November 7, 2016 as he was trying to re-enter the United States from Mexico. He was placed in a jail cell with a confidential informant who wore a hidden microphone which

---

[10]  " 'This is not only a general principle of appellate practice but an ingredient of the constitutional doctrine of reversible error.' " (*Denham v. Superior Court, supra,* 2 Cal.3d at p. 564.)

allowed a conversation between the informant and appellant to be recorded.

In the course of the conversation with the informant, appellant said that "some girl died and some fool died" and that "they" [the police] said that " 'some fool from Pacoima did it.' " Appellant added: "I was, like, what's your problem, fool? I'm, that fool from Pacoima." The informant asked "Oh, for real?" and appellant replied "Yeah, but I didn't do it though."

A little later the following exchange took place:

"[Appellant]: You caught her cheating with somebody else or what?

Confidential Informant: Huh?

[Appellant]: You caught her cheating with somebody else or what?

Confidential Informant: Something like that.

[Appellant]: Something like that? It's something like that.

Confidential Informant: Yeah?

[Appellant]: But I did both of them. [laughs]

Confidential Informant: Oh, for real?

[Appellant]: No, I'm just kidding. Whoo. The f--- do you guys have us in here. We're f---ing innocent until proven guilty."

In the course of the conversation with the informant, appellant revealed his potential motive for the murders. He spoke of Anguiano as the only girl who ever introduced him to her family. He was clearly moved by this.[11] This may have

---

[11] "Her, she introduces me to her moms, oh, mom, this is- this is Jose, this is my mom, this is my sister, and everybody would have been, oh, my God, he's so cute. Like, damn, you came up,

embittered him when he found out about Caceres. When he called Anguiano he heard someone in the background. He told her "you're gonna do me, and, like, you're with some f--ing fool, right now, and that she talking to me and I hear him on the phone- bullshit, won't call me back, and I just call her back and she answered me. Except she hung up . . . Like- like you're doing me like this, like, with another fool? And she was- she didn't even care like, and, like, so what?" The informant said "Yeah" and appellant replied: "She's dead. [laughs]."

## DISCUSSION

### The Ineffective Assistance of Counsel Claim

Appellant's sole contention on appeal is that his trial counsel was ineffective for failing to advise the court that the People's sentencing memorandum was wrong in stating that the court was required to sentence appellant to a term of 25 years to life under section 12022.53, subdivision (d). Appellant further claims his counsel was ineffective for failing to ask the court to exercise its discretion to strike or dismiss these enhancements or to impose lesser ones.

Respondent concedes that the sentencing memorandum was wrong in stating that the court was required to impose the 25-years-to-life enhancement under section 12022.53, subdivision (d). However, respondent contends that there was no reason the court would have stricken or reduced these two enhancements in that these were "brutal special circumstance murders."

To obtain relief based on a claim of ineffective assistance of counsel, appellant must establish (1) that counsel's performance was so deficient that it amounted to a failure to function as

---

you know? Like, damn, you found yourself a good one, you know?"

"counsel" guaranteed by the Sixth Amendment of the United States Constitution and (2) that the deficiency prejudiced the outcome. (See *Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*); see, e.g., *People v. Pensinger* (1991) 52 Cal.3d 1210, 1252.) An attorney's performance is deficient under *Strickland* when the complained of conduct falls below objective standards of reasonableness under prevailing professional norms. (*Strickland*, at p. 688.) Prejudice under *Strickland* is established where there is a reasonable probability that, absent counsel's errors, the outcome of the proceeding would have been different. (*Id.* at p. 694.) A reasonable probability is a probability sufficient to undermine confidence in the outcome. (*Ibid.*)

Senate Bill No. 620 (2017–2018 Reg. Sess.) amended sections 12022.5 and 12022.53 to provide trial courts with discretion to strike or dismiss a firearm enhancement or finding beginning January 1, 2018. (Stats 2017, ch. 682.) Senate Bill No. 620 added the following language to both statutes: "The court may, in the interest of justice pursuant to Section 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section." (§§ 12022.53, subd. (h), 12022.5, subd. (c).) Beginning a few months after the effective date of this legislation, the reviewing courts have enforced and publicized these changes in the law. (See, e.g., *People v. McDaniels* (2018) 22 Cal.App.5th 420, 423 (*McDaniels*).)[12] These changes were, or should have been, common knowledge at the time of appellant's sentencing hearing on September 12, 2019.

---

[12] The opinion and decision in *McDaniels* was filed on April 17, 2018.

11

On the first *Strickland* prong for deficient performance, appellant contends, "Despite the availability and applicability of Senate Bill [No.] 620, . . . counsel inexplicably made no request to strike the firearm enhancements or to impose the lesser firearm enhancement as to some or all of the counts." He also complains counsel failed to correct the prosecutor's error that the imposition of the 25-years-to-life term for the gun enhancement was mandatory. The respondent counters that "a competent defense attorney may have chosen not to point out this error for a very sound reason: there was no basis . . . to ask the trial court to grant such leniency in this case."

Underlying appellant's argument is the notion, based on the prosecutor's sentencing memorandum, the trial court was unaware of its discretion under Senate Bill No. 620. However, the sentencing here took place nearly two years after Senate Bill No. 620 took effect. When the trial court imposed the enhancements at sentencing, it neither agreed nor disagreed with the prosecutor's position in the sentencing memorandum. Indeed, "[a]bsent evidence to the contrary, we presume that the trial court knew the law and followed it. [Citations.]" (*People v. Ramirez* (2021) 10 Cal.5th 983, 1042.)

Furthermore, the law is clear—defense counsel "is not ineffective for failing to make . . . futile motions." (*People v. Thompson* (2010) 49 Cal.4th 79, 122.) Appellant's crimes of murdering two innocent victims by shooting each multiple times at close range over a short romantic relationship gone bad was extremely cruel, callous, and vicious. Under these circumstances, not asking the court to either exercise its discretion to strike the imposition of the gun enhancements or to ask for a lesser enhancement was not deficient performance. On the other hand,

12

counsel's failure to correct the prosecutor's mistake in the sentencing memorandum was deficient performance.

Despite this, appellant falls short on prong two—prejudice. As noted above, establishing prejudice requires a showing of a reasonable probability that absent counsel's deficient performance, the outcome would have been different.

Appellant argues the current societal trend is to move away from imposing lengthy sentences. He also notes the Los Angeles District Attorney's new directive (Special Directive 20-14) specifies that on remand for resentencing, deputies are required to inform the trial court to strike all sentencing enhancements in the interest of justice. These may well be. However, the precise question before us is whether there is a reasonable probability of a different outcome. For this we ask, absent the deficient performance, whether the trial court would have exercised its discretion differently—not whether the deputy district attorney would ask the trial court to dismiss the enhancement based on the new directive. Appellant failed to carry his burden of demonstrating prejudice.

Appellant also points to his colloquy with the trial court as the basis of establishing prejudice. During the sentencing hearing, appellant was apparently smirking. The trial court noted the appellant's demeanor and spoke to appellant in open court, as noted in footnote 5 of this opinion.

After a comment by appellant that seemed to explain he committed the crimes to get over the break-up, the trial court stated, "So I hope at some point, as you heard here today, that you do wake up and you have a soul, regain humanity, but whether or not you do is going to be up to you. You will have a long, long time to think about it." To this, appellant retorted,

13

"I have a long life to live." The trial court replied, "That's fine, but you will be living it in a jail cell and that is unfortunate."

Appellant claims the statement by the trial court reflects a view that the trial court believed the sentence of 54 years to life, consecutive to the two life without the possibility of parole terms, was not necessary. We do not interpret the trial court's statement the same way.

The colloquy happened after the victims' family members gave their impact statements. The trial court clearly believed appellant's attitude and demeanor were inappropriate in the face of what was taking place. While the trial court's comments were not overly harsh in tone, the intended purpose of the statement was not to comment on the appropriateness of the prison term to be imposed. Rather, the trial court made the comment to stop the appellant's inappropriate demeanor in the face of his convictions and the damage he caused to many people.

Again we point back at the evidence adduced at trial. This was a horrendous crime where, at least one of the victims (Anguiano) begged for her life. Instead of heeding the plea for life and exercising restraint and compassion, he shot and killed Anguiano. Not only so, appellant also shot the family dog. Appellant has failed to show a reasonable probability of a different outcome.

## DISPOSITION

The judgment is affirmed.


WILEY, J.

We Concur:


STRATTON, Acting P. J.


HARUTUNIAN, J.*

---

\*    Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

15